**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**LANDMARK AMERICAN**                          **CASE NO. 2:20-CV-01263**
**INSURANCE COMPANY**

**VERSUS**                                     **JUDGE TERRY A. DOUGHTY**

**CHENEL ESTERS, ET AL.**                      **MAGISTRATE KATHLEEN KAY**

**<u>MEMORANDUM OPINION</u>**

A bench trial was held in this proceeding in Lake Charles, Louisiana, on February 6-7, 2023. The Court bifurcated this portion of the trial [Doc. No. 305] on the issue of whether the Plaintiff Landmark American Insurance Company ("Landmark") waived or is equitably estopped from raising its coverage defenses against Defendant Insurance Unlimited of Louisiana, LLC ("IU"). In previously addressing the issue of waiver and/or equitable estoppel, this Court found material issues of fact existed as to whether Landmark waived and/or was equitably estopped from raising its coverage defenses [Doc. No. 212]. The parties waived a jury trial on the waiver/estoppel issue but reserved their right to a jury trial on any remaining issues [Doc. No. 309].

The issue in this bifurcated proceeding is whether Landmark has waived and/or is equitably estopped to assert its coverage defenses. This Court previously found there were material issues of fact existing as to whether Landmark had waived or was equitably estopped from asserting its coverage defenses [Doc. No. 214 and 246].

This Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

# I.  FINDINGS OF FACT

## A.  Hurricane Laura and Valerie Muse's Criminal Conduct

Hurricane Laura made landfall in southwest Louisiana on August 27, 2020, causing significant damage to the Lake Charles, Louisiana area.[1] IU is a licensed independent insurance agency with offices in Lake Charles and other cities in south Louisiana.[2] As part of its business, IU wrote insurance policies which provided property damage coverage.[3]

Valerie Muse ("Muse") was employed as a licensed broker and account manager by IU from June 28, 2010, to September 2, 2020.[4] Approximately one year prior to Hurricane Laura's landfall, Muse began converting cash policy payments by IU customers to her own use.[5] Many of the alleged damages in this lawsuit are a result of Muse stealing customers' premiums which were intended to be used as insurance renewals, new policies, or partial payments on existing policies.[6] However, there are several damage claims which are not related to Muse's theft or conversion but instead due to errors in which Muse failed to procure, renew, or properly set up billing on certain customer policies.[7] After Hurricane Laura's landfall, Muse confessed to stealing customer funds to IU employees Shelly Young ("Young") and Craig Martel ("Martel").[8] IU reported Muse's actions to the Calcasieu Parish Sheriff's Office ("CPSO").[9] CPSO then began an investigation, leading to criminal charges against Muse.[10] She ultimately plead guilty to several felonies.[11]

After IU began receiving property damage claims from customers who believed they had

---

[1] [Doc. No. 342, p. 13]
[2] [Id. at pp. 12-13]
[3] [Id.]
[4] [Doc. No. 168-2, p. 2]
[5] [Id.]
[6] [Doc. No. 214]
[7] [Id.]
[8] [Doc. Nos. 343, p. 6-7 and 342, pp. 15, 17]
[9] [Doc. No. 342, pp. 17, 34].
[10] [Doc. No. 339-1, pp. 82-83, 86-87]
[11] [Id.]

policies subject to Muse's actions, Young performed an investigation to determine the extent of damages.[12] The following customers made claims as a result of Muse's actions or inactions: (1) Chanel Esters ("Esters"); (2) Harold Iles ("Iles"); (3) Christina Landry ("Landry"); (4) Heidi and Casey LeBlanc ("LeBlanc"); (5) Dalbert Leday ("Leday"); (6) Karl Martin ("Martin"); (7) Walter Somers ("Somers"); (8) Michael Willis ("Willis"); (9) Clarence Thibodeaux ("Thibodeaux"); (10) Sam's Residential, LLC ("Sam's Residential"); (11) Gloria Robinson ("Robinson"); and (12) Manick Investments, LLC ("Manick").[13] IU paid all of the individual claimants.[14]

### B. Coverage Dispute

Prior to Hurricane Laura, IU purchased a professional liability insurance policy with Landmark.[15] IU alleges it is subrogated through Landmark for the amount it paid to settle the claims.[16] The policy has aggregate limits of $4,000,000.00 and a $25,000.00 deductible. The claims involved in this suit can be described as "theft" and "non-theft" claims.

"Theft" claims include all claims where Muse actually converted insurance premiums to her own use. This Court previously determined that Exclusion "O" of the Landmark policy excludes coverage for the "theft" claims.[17] The first sentence of Exclusion "O" in the Landmark policy excludes coverage for damages arising out of the co-mingling, conversion, misappropriation or defalcation of funds or other property.[18]Exclusion "O" also excludes claims for the inability or failure to pay, collect, disburse, or safeguard any funds held by an insured.[19] This Court found that theft claims include the claims of Esters, Iles, Landry, LeBlanc, Leday, Martin, Somers, Willis,

---

[12] [Doc. No. 339-2, pp. 21-23]
[13] [Doc. Nos. 339-3, pp. 168-225]
[14] [Doc. No. 152]
[15] [Doc. No. 339-1, p. 3]
[16] [Doc. No. 152]
[17] [Doc. No. 214 and 246]
[18] [Doc. No. 339-1, p. 8]
[19] [Id.]

and Thibodeaux.[20]

 "Non-theft" claims are the claims not excluded by Exclusion "O" of the Landmark policy. This Court found non-theft claims included the claims of Sam's Residential, Manick, and Robinson.[21] On the Sam's Residential claim, this Court found there were material issues of fact whether that claim was excluded under the second sentence of Exclusion "O".[22] This Court also found Landmark violated its duty to defend the "non-theft" claims.[23]

 The issue in this bifurcated proceeding is whether Landmark has waived and/or is equitably estopped to assert its coverage defenses. This Court previously found there were material issues of fact existing as to whether Landmark had waived or was equitably estopped from asserting its coverage defenses.[24]

### C.  IU and Landmark's Interactions in the Wake of Muse's Conduct

 On September 2, 2020, IU notified its broker, Independent Insurance Agents & Brokers of Louisiana ("IIABL"), of the potential claims.[25] Rhonda Martinez ("Martinez"), a representative of IIABL, then provided notice of the claim to Landmark's broker, AmWINS.[26]

 On September 3, 2020, David Bailey ("Bailey"), an AmWINS employee, emailed Martinez to verify the claims being made.[27] Landmark assigned the claims to Matthew Lange ("Lange").[28] Lange spoke to IU's President Edwin Robinson ("Robinson") by telephone.[29] Robinson told Lange all of the facts he was aware of at that time.[30] Robinson also asked Lange about an attorney to help

---

[20] [Id.]
[21] [Doc. No. 246]
[22] [Id.]
[23] [Id.]
[24] [Doc. No. 214 and 246]
[25] [Doc. No. 343, pp. 46-47]
[26] [Id.]
[27] [Doc. Nos. 339-1, pp 28-34; 343, pp. 49-51]
[28] [Id. at pp. 19-20]
[29] [Id.]
[30] [Id.]

IU with this situation.[31] Lange told Robinson he would contact a local lawyer to "help" IU.[32]

After talking with Robinson, Lange emailed Robert Orr ("Orr") at Landmark and advised Orr that IU was making both claims involving fraud by Muse and separate errors and omissions ("E&O") claims, which involved negligence by Muse.[33] Lange then emailed Charles "Chip" Hellmers, III ("Hellmers"), an attorney based in New Orleans, who had previously defended IU. Lange wrote:

> We have received a new claim (possibly claims) for the above insured. At present, I have very little documentation. In short, insured has learned that an employee or agent was binding coverage but stealing the premiums. The policies were subsequently cancelled for non-payment. Now, particularly in light of the recent hurricane, claims are being filed and coverage denied.
>
> Insured is just learning of this. They need counsel to advise them and formulate a plan to handle incoming claims once denied by the carriers. We are currently reviewing coverage, but they need advice.
>
> I also learned in my conversation with the insured that they have other claims coming in for E&O by the same agent, but unrelated to the theft. I am not yet in receipt of those, but they are forthcoming. Insured will need counsel on those as well. To the extent coverage is available, we may need to coordinate with local adjusters like Engle Martin to act as de facto property adjusters.
>
> Please advise if you can handle. If you can, to the extent you can, touch base with the insured (Eddie Robinson at 337-794-4009) today, would be appreciated. They are quite stressed at present.[34]

Later during the afternoon of September 3, 2020, Hellmers responded to Lange's email as follows:

> I spoke with Eddie [Robinson] briefly, and he and I will speak again this afternoon. I'll follow up with you as soon as I talk to him further.
>
> Thank you for the referral. We tried a case in Cameron Parish for this group several years ago.[35]

---

[31] [Id. at p. 22]
[32] [Id. at pp. 22-23]
[33] [Doc. No. 339-1, pp 53-54]
[34] [Id. at p. 56]
[35] [Id. at p. 66]

Then, Lange responded to Hellmers' email as follows:

> Thanks, Chip. Coverage is undetermined on the theft-related claims. However, in speaking with Eddy [Robinson] it sounds like there are more claims related to this employee that may not be theft-related forthcoming.[36]

Later, in the afternoon of September 3, 2020, Hellmers contacted IU, asked Robinson "a bunch of questions about what was going on," and scheduled a meeting in Lake Charles for the next day, September 4, 2020, to advise IU and set a plan moving forward on how to address the issues.[37] That same afternoon, Lange sent Robinson a letter which contained the following language:

> Pending further investigation and its definite coverage position, Landmark is proceeding in this matter without waiving any of its rights, privileges, and defenses available under the captioned policy or at law by or on behalf of Landmark, or not stating should be construed as a limitation or waiver of any such rights privileges or defenses. Our full coverage position will follow at the earliest opportunity.[38]

After Hellmers' telephone conversation with Robinson, and before their scheduled personal meeting, Hellmers sent the following email to Lange:

> I left you a telephone message a few minutes ago, but I wanted to briefly follow up on my conversation with Eddy Robinson. He was able to speak briefly about the matter, as they currently understand it. He and his office manager generally went through the detail associated with the incident. Apparently, one of their Customer Service Agents, Valerie Muse, has acknowledged that she failed to send premium payments to a carrier on one policy that resulted in a cancellation. She was either diverting the cash or using it to make other premium payments. (Mr. Robinson did not know what she did with the funds, and she has not given much of an explanation). She later called the office manager and recalled an additional four (4) policies that were either cancelled or never bound because of premium diversion. They expect that there will be more. They have filed a police report with the Calcasieu Parish Sheriff's Office, and they expect a warrant to be issued shortly. They are now identifying

---

[36] [Id. at p. 55]
[37] [Doc. No. 342, pp. 23, 25-26]
[38] [Doc. No. 339-1, p. 81]

additional situations where certain policies were not properly handled and may have been cancelled because of Ms. Muse.

I am going to be in Lafayette tomorrow on another matter and have agreed to meet with Mr. Robinson, his office administrator, and their billing manager later in the day. They are still trying to get an understanding of the scope of the potential loss, and they are in the process of marshalling information to further develop that issue. Unfortunately, IU's offices are working off of generator power, so there is some delay on that front. In addition, they are fielding calls on numerous property damage claims as well.

It will probably be worthwhile to consider an adjuster on the front end, particularly for those properties that may have more dramatic losses. Mr. Robinson was under the impression that the agency had heard from each of the five (5) customers that believed they had coverage. He did not have any information on the nature or extent of the losses involved.

If you have a few minutes to touch base tomorrow morning, it would be helpful for us to visit on a plan going forward.[39]

Based on the foregoing communication, Robinson maintained that IU was unaware that Hellmers was reporting to Landmark about their conversations.[40] IU believed that Hellmers was acting as its counsel.[41]

On the morning of September 4, 2020, Lange forwarded Hellmers' September 3 email to George Fagan ("Fagan"), Landmark's outside counsel and the attorney handling Landmark's coverage determination.[42] At 1:39 p.m. on September 4, 2020, just before Hellmers' in-person meeting with Robinson, Fagan emailed Robinson a letter denying coverage for all claims involving Muse "stealing premium dollars intended for insurers."[43] In this letter, Landmark requested additional information about the claims and reserved rights to deny coverage.[44]

---

[39] [Id. at p. 63]
[40] [Doc. No. 342, pp. 36-39]
[41] [Id.]
[42] [Doc. No. 339-1, p. 64]
[43] [Id. at pp. 35-43]
[44] [Id.]

At approximately 2:00 p.m. on September 4, 2020, Hellmers and Robinson met at Robinson's house and discussed potential claims for Muse's failure to procure property and casualty coverage (the non-theft claims).[45] Hellmers told Robinson that he was not allowed to discuss the theft related claims because Landmark was denying coverage for those.[46] There is no evidence that Hellmers discussed the theft claims with IU.[47] Robinson believed Hellmers to be appointed by Landmark as IU's attorney and did not know Hellmers was reporting their conversations to Landmark.[48] After their meeting, Robinson never heard from Hellmers again regarding the claims.[49]

On September 25, 2020, (three weeks after the in-person Hellmers-Robinson meeting), Landmark filed a Complaint against IU and its customers, seeking a declaratory judgment that there was no coverage under the Landmark policy for both theft and non-theft claims.[50] The Complaint was amended and/or restated on March 10, 2021, and on December 28, 2021.[51] The Second Amended and Supplemental and Restated Complaint (which replaces and supersedes Landmark's previous complaints) asks for a declaratory judgment that there is no coverage under the Landmark policy, an interpleader regarding IU's customers, and a declaration that Landmark did not have a duty to defend IU.[52]

Hellmers,[53] Robinson,[54] and Lange[55] testified at trial. Lange also testified as Landmark's

---

[45] [Doc. No. 342, pp. 27-28, 109]
[46] [Id.]
[47] [Id. at pp. 27-28,
[48] [Id. at p. 24-27, 30]
[49] [Id. at pp. 31, 182]
[50] [Doc. No. 1]
[51] [Doc. Nos. 65, 149]
[52] [Id.]
[53] [Doc. No. 342, pp. 100-131]
[54] [Id. at pp. 11-100]
[55] [Doc. No. 343, pp. 54-107]

designee in a corporate deposition[56] which was entered into evidence in his corporate testimony.

### 1. Edward Robinson

Robinson testified that after Hurricane Laura, IU began receiving calls regarding the applicable policies.[57] After having the situation reported to Landmark, Robinson talked with Lange on September 3, 2020.[58] Robinson said he asked Lange about an attorney to help, and that Lange told him Lange would contact a local lawyer to "help" IU.[59]

Robinson further testified he talked with Lange by telephone on September 3, 2020, to set up a meeting for the next day.[60] About twenty minutes prior to their September 4, 2020, meeting, Hellmers called Robinson to tell him that Landmark was denying coverage on the theft claims, and he could not talk to Robinson about that, but he would still come and talk to Robinson about the non-theft claims.[61]

Robinson testified he met with Hellmers on September 4, 2020, and told him about the non-theft claims.[62] Robinson testified he thought Hellmers was IU's attorney and was unaware Hellmers was reporting the communications he had with Hellmers back to Landmark.[63] Robinson also testified he never heard back from Hellmers again regarding this matter after September 4, 2020.[64]

### 2. Carl "Chip" Hellmers, III

Hellmers also testified at trial.[65] He verified Lange's emails and that he spoke and

---

[56] [Doc. No. 339-4, pp. 355-480]
[57] [Doc. No. 342, pp. 14-16]
[58] [Id. at pp. 19-20]
[59] [Id. at p. 22]
[60] [Id. at pp. 26-27]
[61] [Id. at pp. 27-29]
[62] [Id. at p. 30]
[63] [Id. at pp. 26, 31]
[64] [Id. at p. 31]
[65] [Id. at pp. 100-131]

personally met with Robinson.[66] Hellmers' version of events was that he was contacted by Landmark to talk with IU "subject to [the] coverage" determination/evaluation.[67] Hellmers stated he anticipated being hired if there were coverage issues, but that he was never actually hired by Landmark to represent IU.[68]

Hellmers testified that on the way to meet with Robinson on September 4, 2020, he received a call from Lange that Landmark was denying coverage on all claims, and he was not going to be retained.[69] Hellmers testified he called Robinson and told him this, but that Robinson still wanted to meet with him, so he met with Robinson in Lake Charles.[70]

Hellmers testified he was never hired by Landmark and never represented IU.[71] He did not receive any payment from either Landmark or IU for his time.[72] Helmers stated he told Robinson that his involvement was dependent upon coverage determination.[73] He denied being aware of any distinction between the theft and the non-theft claims, stating "[t]he communication that was made to me was not in the context of, well, there's a distinction between theft and non-theft at that point."[74]

### 3.    Matt Lange

Lange testified for Landmark in a corporate deposition[75] and testified personally at trial.[76] In his corporate deposition, Lange testified he did not appoint Hellmers to represent IU, but rather he asked Hellmers to talk to IU as a favor.[77] Lange also testified that after Hellmers talked with

---

[66] [Id. at pp. 102, 103, 109]
[67] [Id. at pp. 103, 107, 108, 116, 120, 129]
[68] [Id. at p. 105]
[69] [Id. at pp. 112-113]
[70] [Id.]
[71] [Id. at pp. 116-117]
[72] [Id. at p. 117]
[73] [[Id. at pp. 103, 107, 108, 116, 120, 129]
[74] [Id. at p. 114]
[75] [Doc. No. 339-4, pp. 355-480]
[76] [Doc. No. 343, pp. 54-107]
[77] [Doc. No. 339-4, p. 383; 342, pp. 72, 89]

and met with Robinson, Hellmers sent emails to him reporting on information that Robinson shared with Hellmers.[78]

Lange also testified that he forwarded the information he received from Hellmers to Landmark's coverage counsel, George Fagan.[79] At trial, Lange acknowledged that he was aware IU was claiming there were both theft claims and non-theft claims.[80] After talking with Robinson on September 3, 2020, Lange testified that coverage was still undetermined.[81] Lange put IU in touch with Hellmers who he thought might "help" IU.[82] Lange stated that normally coverage would need to be determined prior to assigning an attorney to represent IU.[83] Lange further testified that around mid-afternoon on September 3, 2020, after he talked with his supervisor, Robert Orr ("Orr"), a determination was made by Landmark to deny coverage.[84] He then instructed Landmark's coverage counsel to draft a disclaimer for review and approval.[85] That disclaimer letter was emailed by Landmark to IU at 1:39 p.m., just prior to Hellmers' meeting with Robinson on September 4, 2020.[86]

Lange's testimony was inconsistent with Hellmers as to the extent of the coverage denial because Lange admitted testifying in his corporate deposition that the denial of coverage only included the theft claims and not the non-theft claims. Lange also admitted he was aware IU was maintaining there were both theft and non-theft claims.

### 4.    **Shelly Young**

Young testified at trial. She was IU's Office Manager and was given the job of investigating

---

[78] [Doc. No. 339-4, pp. 386-387; 342, p. 82]
[79] [Id. at, pp. 386-387; at p. 98]
[80] [Doc. No. 343, p. 69, 90
[81] [Id. at pp. 70, 72, 73, 74, 97-98]
[82] [Id. at p. 70]
[83] [Id. at pp. 70, 72, 97-98]
[84] [Id. at pp. 84, 99, 101, 102-103]
[85] [Id. at p. 79]
[86] [Doc. No. 339-1, pp 35-42]

Muse's actions/inactions.[87] She identified five possible non-theft claims as of September 4, 2020.[88] The non-theft claims identified were Esters, Somers, Thibodeaux, Sam's Residential, and Robinson.[89] She later determined that Esters and Somers should not be included in the non-theft claims.[90]

Young prepared the Notice of Losses that were sent to Landmark.[91] The Notice of Losses in the non-theft claims were sent on September 9, 2020, and again on September 16, 2020.[92] Young testified that Muse used the wrong mailing address for Robinson, which resulted in Robinson not getting notices from the insurance carrier.[93] In the Sam's Residential and Manick claims, Muse was supposed to move the policy to another insurer but did not.[94] Young further testified that Muse confessed to her that Muse had "done wrong."[95] Muse took cash from IU customers and pocketed it.[96] Muse also "dropped the ball" in other situations and caused some of the insureds not to have coverage.[97]

### 5.    Craig Martel

Martel also testified at trial.[98] Martel has been an employee of IU for 18 years.[99] He was present at the meeting with Hellmers on September 4, 2020.[100] Martel set up the meeting with Hellmers.[101] Martel corroborated Robinson's testimony that Hellmers told IU that Hellmers could

---

[87] [Doc. No. 339-2, pp. 21-23]
[88] [Doc. No. 342, pp. 133-137]
[89] [Id.]
[90] [Id. at p. 147, 148, 157, 166]
[91] [Doc. No. 339-3, pp. 168-225]
[92] [Id.]
[93] [Doc. No. 342, p. 84]
[94] *See* [Doc. No. 339-4, pp. 623- 636]
[95] [Doc. No. 343, p. 152]
[96] [Id. at pp. 144-145]
[97] [Id. at p. 154]
[98] [Id. at pp 173-192; Doc. No. 343, pp. 196-223]
[99] [Doc. No. 342, p. 18]
[100] [Id. at p. 176]
[101] [Id. at p. 177]

not talk to IU about the theft claims but could talk to them about the non-theft claims.[102]

Martel testified that when Hellmers called Robinson just prior to their September 4, 2020, meeting that Hellmers told Robinson that Landmark was denying the theft claims, but he would go ahead and meet with IU about the non-theft claims.[103]

Martel testified that at the September 4, 2020, meeting, Hellmers advised them on how some of the claims could be worked out and a "game plan" for the non-theft claims.[104] He further testified that Hellmers did not discuss any of the theft-related claims at the meeting,[105] that Hellmers took notes at the meeting,[106] and that Hellmers never disclosed to IU that he would be sharing the information he obtained from the meeting with Landmark.[107] Although Martel testified that he thought Hellmers was representing Landmark, he clarified later that he thought that, by representing Landmark, Hellmers was also representing IU.[108] According to Martel, Hellmers never told IU that he was representing landmark, that he was not representing IU, or that he was doing IU a "favor."[109] Martel further verified IU never heard back from Hellmers after September 4, 2020.[110]

### 6. Jeff Albright

Jeff Albright ("Albright") also testified at trial.[111] He works for Independent Insurance Agents of Louisiana.[112] He procured the Landmark policy for IU and was somewhat involved in the claims process.[113] Albright was aware of Muse's actions as early as September 2, 2020, but

---

[102] [Id. at p. 179]
[103] [Id. at p. 189]
[104] [Id. at p. 180]
[105] [Id. at p. 179]
[106] [Id. at p. 180]
[107] [Id. at p. 181]
[108] [Doc. No. 343, pp. 18, 22]
[109] [Doc. No. 342, pp. 181, 183]
[110] [Id. at p. 182]
[111] [Doc. No. 343, at pp. 30-42]
[112] [Id. at p. 30]
[113] [Id. at pp. 30-31, 33-36]

believed that the non-theft claims would be covered under the policy.[114] At some point between September 2, 2020 and October 15, 2020, Albright became aware that Landmark was denying the non-theft claims as well as the theft claims.[115] Albright did not recall reading the declination letter.[116]

### 7.    Rhonda Martinez

Martinez also testified at trial.[117] Martinez has worked for Independent Insurance Agents of Louisiana for twenty-seven years and is involved with the E&O (errors and omissions) Program.[118] IU is one of the companies that bought E&O coverage through Independent Insurance Agents of Louisiana.[119]

Martinez verified various emails with Wendy Johnson ("Johnson") of Landmark about the IU claims.[120] Martinez also verified that she sent Lange an email on October 13, 2020,[121] requesting information on Landmark's position as to the non-theft claims.[122]

### 8.    Paul Lanier

Paul Lanier ("Lanier"), the Chief Financial Officer ("CFO") with IU, also testified at trial.[123] Lanier testified he was present at the September 4, 2020, meeting.[124] He verified Robinson and Martel's testimony that Hellmers discussed the non-theft claims and took notes during the meeting.[125] Lanier also testified that he recalled Hellmers discussing the $25,000.00 deductible at

---

[114] [Id. at p. 32, referencing [Doc. No. 339-1, p. 88]]
[115] [Id. at p. 32-33, referencing [Doc. No. 339-3, p. 164]]
[116] [Id. at p. 36]
[117] [Doc. No. 343, pp. 43-58]
[118] [Id. at pp. 43-44]
[119] [Id.]
[120] [Id. at pp. 46-47]
[121] [Doc. No. 339-4, pp. 551-552]
[122] [Doc. No. 343, pp. 54-55]
[123] [Doc. No. 342, pp. 170-172]
[124] [Id. at p. 171]
[125] [Id. at p. 172]

the meeting.[126]

## II. CONCLUSIONS OF LAW

As explained below, the Court finds that Landmark did not waive its right to assert coverage defenses because it explicitly reserved its rights soon after receiving notice of the circumstances.[127] Additionally, the Court finds that Landmark is not equitably estopped from raising its coverage defenses because IU cannot establish a change in position to its detriment resulting from the actions/inactions of Landmark.[128] As this Court previously found that there was no coverage under the Landmark policy for the theft claims under Exclusion "O," the issues regarding coverage of the theft claims are resolved, and Landmark is not required to indemnify IU for the settlements it paid on the claims of Esters, Iles, Landry, LeBlanc, Leday, Martin, Somers, Willis, and Thibodeaux.[129]

### A. Waiver

Waiver is generally understood to be the intentional relinquishment of a known right, power, or privilege. Waiver occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. A waiver may apply to any provision of an insurance contract, even though this may have the effect of bringing within coverage risks originally excluded or not covered. *See Steptore v. Masco Const. Co.,* 93-2064 (La. 8/18/94), 643 So. 2d 1213, 1216 (holding that waiver requires a party's knowledge of an existing right, an actual intention to relinquish that right, and conduct that is inconsistent with any other intent).

It is well established that an insurer is charged with knowledge of the contents of its own

---

[126] [Id.]
[127] *See infra*, pp. 15-17.
[128] *See infra*, pp. 17-20.
[129] *See infra*, p. 20.

policy. *Id*. (citations omitted). In addition, notice of facts which would cause a reasonable person to inquire further imposes a duty of investigation upon the insurer, and failure to investigate constitutes a waiver of all powers or privileges which a reasonable search would have uncovered. *Id*. Waiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest. *See* La. Rules of Professional Conduct, Rule 1.7. *Id.* Accordingly, when an insurer, with knowledge of facts indicating noncoverage under the insurance policy, assumes or continues the Insured's defense without obtaining a nonwaiver agreement to reserve its coverage defense, the insurer waives such policy defense. *Id.*

In *Steptore*, the insurance carrier named a law firm to represent both itself and the insured without reserving the right to deny coverage under the policy. *Id*. at 1215. The attorneys representing the insurer and the insured held discussions with the insured about the accident and continued to represent the insured. *Id*. Later, the information obtained by the attorneys from the insured was used to deny coverage. *Id*. The Court found that the insurer had waived any coverage defenses it had under its policy because it represented both the insured and the insurer without reserving its rights. *Id*. at 1217. As a result, when the insurer's interests conflicted with those of the insured, it was held to have waived its coverage defenses. *Id*.

IU argues that Landmark waived its coverage defenses when it hired Hellmers to represent both IU and Landmark even though Landmark knew it was going to dispute coverage. However, there is a clear distinction between Landmark's actions and those taken in *Steptore*.

Here, Landmark reserved its rights soon after receiving notice of the circumstances. Lange's September 3, 2020, letter read as follows:

> Please be advised that a coverage determination in regard to the above-referenced claim has not yet been made. In the interim, please be reminded that the captioned Policy provides Landmark with a right and duty to defend claims in accordance with the Policy terms and conditions. Absent a coverage denial, and assuming a duty to defend is owed under the Policy, Landmark will appoint counsel to defend this matter, if required. If there is an urgent defense issue, you must contact me immediately in that regard.

The letter further stated:

> Pending further investigation and its definitive coverage position, Landmark is proceeding in this matter without waiving any of its rights, privileges, and defenses under the captioned policy or at law. Nothing stated by or on behalf of Landmark, or not stated, should be construed as a limitation or waiver on any such rights, privileges, or defenses. Our full coverage position will follow at the earliest opportunity.

Lange testified that the September 3, 2020, reservation of rights letter includes an "acknowledgement and reservation of rights that is sent on new claims once a claims number is assigned" and its purpose was "[t]o acknowledge receipt, advise of the claim number, and reserve our rights as we review the coverage."[130]

Although the Court finds that IU believed Hellmers represented it when Hellmers met with IU employees and discussed the non-theft claim, and that Hellmers forwarded the information he received from IU regarding the non-theft claims to Landmark without IU's consent, there still is no evidence of a voluntary or intentional waiver by Landmark. Unlike the attorney in *Steptore*, Landmark clearly reserved its rights to deny coverage. Therefore, there was no intentional relinquishment of the right to deny coverage by Landmark.

Accordingly, the Court finds that Landmark did not waive its right to assert coverage defenses.

---

[130] [Doc. No. 243, pp. 273-274]

### B.    Equitable Estoppel

Unlike waiver, equitable estoppel (or detrimental reliance) requires a party to prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *See Luther v. IOM Co., LLC*, 130 So. 3d 817 (La. 2013); Louisiana Civil Code Article 1967.

Many courts have used the doctrine of equitable estoppel to prohibit an insurer from denying coverage if the insured is prejudiced by the insured's conduct. *See Founders Ins. Co. v. Oliving,* 894 N.E.2d 486, 592 (Ind. Ct. App. 2018). The argument for prejudice is stronger when there is a conflict of interest that entitles the insured to independent counsel. *See United States Fidelity & Guaranty Co. v. N.Y. Susquehanna & W. Ry. Corp.*, 713 N.Y.S.2d 624 (App. Div. 2000).

### 1.    Theft Claims

Landmark denied coverage on the theft claims prior to Hellmers' meeting with IU. There is no dispute that the information given by IU related to the non-theft claims, not the theft claims. Because IU did not disclose confidential information to Hellmers about the theft claims, there can be no estoppel on the theft claims.

### 2.    Non-theft claims

The confidential information disclosed to Hellmers by IU related to the non-theft claims. IU thought Hellmers was representing them when information regarding the non-theft claims was disclosed to him, and Hellmers disclosed that confidential information to Landmark without IU's consent. The first two elements of equitable estoppel (representation by word or conduct and justifiable reliance) are met. A more complicated issue is whether there was a change in IU's position because of the reliance.

Landmark argues that IU was required by the terms of its policy to provide the information

regarding the non-theft claims whether or not Hellmers disclosed the information. Landmark also argues no information was disclosed that Landmark would not have gotten anyway, and, therefore, there was no change by IU to their detriment.

IU argues that all of the information it gave to Hellmers was confidential because it thought Hellmers was their attorney, Hellmers disclosed that information to Landmark, and Landmark used that information to file its suit against IU and its clients on September 25, 2020. The information Hellmers gave to Landmark is set forth in Hellmers' emails to Lange. In the first email sent by Hellmers to Lange on September 3, 2020,[131] the only information Hellmers provided to Landmark was that there were more claims coming from IU which were not theft related.[132]

In the second email sent by Hellmers to Lange on September 3, 2020, Hellmers told Lange that IU had told him that (1) Muse was either diverting cash or using cash to make other premium payments; (2) that Muse acknowledged she had failed to send premium payments to a carrier on one policy that resulted in cancellation; (3) that IU did not know what Muse had done with the funds; (4) that Muse had recalled an additional four policies that were either cancelled or never bound due to premium diversion; (5) IU was identifying additional situations where certain policies were not properly handled, theft may have been cancelled due to the actions or inactions of Muse; and (6) that IU did not have any information on the nature or extent of the losses involved.[133] Hellmers then told Lange it would be helpful for "us to visit on a plan going forward."[134] This email was forwarded to Landmark's coverage counsel by Lange.[135]

After the September 4, 2020, meeting between Hellmers and IU, there is no evidence of

---

[131] [IU 324 Exh. 7]
[132] [Doc. No. 339-1, p. 56]
[133] [Id. at p. 63]
[134] [Id.]
[135] [Id. at p. 64]

any email between Hellmers and Lange which disclosed information given to Hellmers by IU at that meeting.

IU is not able to meet the third element of equitable estoppel, which requires a change in position to one's detriment because of the reliance. Although IU believes Hellmers represented them, and disclosed the information to Landmark without IU's consent, there is no evidence of detrimental reliance. The theft claims had already been denied as covered by Landmark and Hellmers did not talk with IU about these claims.

Although the evidence shows that Landmark did not deny coverage as to the non-theft claims until after September 4, 2020, IU cannot point to any change in position by IU to their detriment.

Accordingly, Landmark is not prohibited from raising its coverage defenses against IU. As this Court previously found that there was no coverage under the Landmark policy for the theft claims under Exclusion "O," the issues regarding coverage of the theft claims are resolved. Landmark is not required to indemnify IU for the settlements it paid on the claims of Esters, Iles, Landry, LeBlanc, Leday, Martin, Somers, Willis, and Thibodeaux.

### C. Remaining Issues

The remaining issues in this case are (1) damages concerning the Robinson and Manick claims; (2) whether the Sam's Residential claims are covered under the policy and, if so, the amount of damages; and (3) issues regarding whether penalties, damages, and/or attorney fees are owed to IU on the basis of La. R.S. 22:41(13), 22:1892 and 22:1973.

The issue regarding attorney fees due to violation of the duty to defend will be decided by the Court after the other issues are resolved.

## III.    CONCLUSION

In accordance with this Opinion, Insurance Unlimited's demand that Landmark is barred from presenting coverage defenses against it based upon waiver and/or equitable estoppel is **DENIED**.

MONROE, LOUISIANA, this 8th day of May 2023.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**